The first case we have before us this morning is Hassan v. Atalby City of New York, No. 14-1688. Mr. Azmi, am I pronouncing it correct? Yes, Your Honor. Azmi? Yes. And Mr. Farrell? Good morning. May it please the Court, I am Azmi from the Center for Constitutional Rights, along with co-counsel Muslim Advocates and Gibbons, PC, on behalf of plaintiffs. With the Court's permission, I would like to reserve two minutes for remodeling. No problem at all. Your Honors, in this case, the District Court failed to evaluate, let alone credit, plaintiffs' well-plaid allegations that they were subject to a facially discriminatory city policy. What is the policy? I mean, I've looked for a policy. You seem to have assumed that there is a policy of surveillance for Muslims, but you don't point to anything that has been said or written to demonstrate such a policy. Well, under Monell, Your Honor, we don't need to demonstrate, particularly at the pleading stage, that we have a formal written decree. As you know, we can show a policy or a custom or a usage, and we've pled ample facts demonstrating that the city has singled out Muslims alone for differential treatment. And the scope of the program certainly supports, at the pleading stage, the notion that there is a policy or a custom. But what has happened since 9-1-1, and more importantly in Paris the other day, indicates that there are legitimate police investigatory reasons for this surveillance. We respectfully disagree, Your Honor. We take no issue with the notion that there are serious security threats in this world, including threats from terrorism and those who identify as Muslim terrorists. But the question is, what means do the law enforcement use to, quote, investigate? This is actually a blunderbuss, suspicionless program based on nothing other than individuals' religiosity. It's not based on any indicia of suspicion whatsoever. Can you have a constitutional injury if all the alleged surveillance occurred in public places or places to which the public was invited? You can, Your Honor, if the surveillance is based on a discriminatory classification. That's Judge Roth's opinion in Anderson v. Davila. The injury the Supreme Court has repeatedly recognized comes from being classified on the basis of a protected characteristic. That's what's true in the affirmative action cases, the racial gerrymandering cases. And I would stress, in particular, this Court's decision in Hall v. Pennsylvania State Police from 1978. That case involved the police requiring a bank to surveil all, quote, suspicious males entering the bank. The Court recognized that surveillance of anyone would not be constitutionally problematic. But singling out surveillance on the basis of a protected characteristic in and of itself states a claim and is sufficient injury. And the same would apply in this case. Is it a, when you say a claim, are we talking about a subjective chill in plaintiff's rights and activities as in Laird? No, Your Honor. In Laird, what's very clear about Laird is that the plaintiffs there, all they challenged was the, quote, near existence without more of an Army data gathering program. They could do nothing to connect the program to any personal injury. All they alleged was a vague and totally speculative chill to some unspecified First Amendment activities in the future. And Anderson v. Davila distinguishes Laird. Davila. Excuse me? Davila. Davila, excuse me. I'm trying to remember it well. Distinguishes Laird and Philadelphia yearly on that basis where classification is an injury. In addition, unlike the Laird plaintiffs, in addition to the classification, they allege present harm to their religious activities. The institutional plaintiffs, the mosques who were in fact subject to surveillance, allege that they experienced a decrease in congregants. And the MFI plaintiffs allege that they had to change their programming in response to the surveillance program. And the Presbyterian Church case in the Ninth Circuit says that surveillance that decreases the ability of an institution to fulfill its religious mission states an injury in fact. In response to Judge Roth, you mentioned that a policy need not be shown at this stage of the proceedings. And if I heard you correctly, you mentioned that you only need as a policy a custom or a practice. Is that correct? Yes. Which one is it that you are asserting in this case? We allege both, Your Honor, and I think we're entitled to do that. Both of these? We allege policy or custom at the pleading stage. And, of course, we can allege alternate theories. Custom in the sense that the NYPD has a custom of surveilling a certain group? Yes, Your Honor. That is a religious group. Exactly. The only search criteria here for this program is religion. And the program of the policy is quite vast. We allege that it sought to infiltrate every mosque within a 250-mile radius and, in fact, developed analytical reports on every mosque within a 100-mile radius, including our plaintiffs. They infiltrated houses of worship. We allege took notes of and tried to surveil thousands of sermons. They had through mosque crawlers, photographing, videotaping. They had so-called rakers surveilling all manner of businesses, particularly in Newark, taking minute, detailed accounts of customer behavior, of employee behavior, emphasizing religiosity again. They had weekly reports of MSAs, including two MSAs in New Jersey. Nothing wrong with a police officer from New York City going into a mosque in New Jersey? It is if it's subject to a city policy or custom that only singles out mosques but not churches, MSAs but not Hillel. Look at Iqbal, for instance, the fact that 9-1-1 has made us focus upon terrorism among certain extreme Muslim groups. And how do you find out where they are? We have learned since then that there's a lot of recruitment of young men in mosques by imams who are giving terrorist-supported sermons and recruiting, sending them to Syria, et cetera. How do you find out where that's going on unless, one, you focus on mosques, you focus on Muslims? If you go to the Baptist church, you aren't really going to find out anything that's relevant, are you? Three responses, John. First, just very quickly, Iqbal really has nothing to do with this. In Iqbal, the problem there was, of course, pleading. They could not plead a facially discriminatory policy. It was a case where a Muslim was saying, look, I'm in the hot spot because I'm a Muslim. Yes, and it couldn't plead it in the way we have. There's nothing in Iqbal. In fact, Iqbal goes to pains to stress that this policy, which ultimately was just a disparate impact, there are no allegations, well-pled, non-conclusory allegations of a facially discriminatory policy. Iqbal sounds a lot like Laird. Iqbal is, yeah, in that sense is Laird, and they're both distinguishable when we have detailed allegations of discriminatory treatment. Iqbal, if I remember correctly, was the target of an investigation. He was already being targeted because of potential relationship to 9-11. Precisely, Your Honor. He was designated a high-suspect individual, unlawfully present in this case, pursuant to a neutral investigative program into 9-11. There is no criminal investigation at work here, as we allege. It is blunderbuss suspicion. Ultimately, the question, Your Honor, Judge Roth, is these kinds of classifications have to trigger strict scrutiny. They cannot be dismissed on the pleadings. If the NYPD can demonstrate that it is narrowly tailored and necessary to surveil a Muslim school for 8-year-old girls in order to root out terrorism, they will have every opportunity after discovery and at summary judgment. This case is not over at the pleadings. We have, consistent with our obligations and Iqbal pled, what we need to plead to proceed. Is your complaint, in addition to making a religion-based classification, was it also making an ethnicity-based classification as well? No, Your Honor. At least in those three lines, I thought that might have been the case. It isn't, Your Honor. Your Honor, we allege that there is discrimination on the basis of religion under the Equal Protection Clause. Religion, as such, being protected as a classification of the Equal Protection Clause and under the First Amendment, the Establishment and Free Exercise Clause. And if I could just add a couple of our standing allegations. The classification of the Equal Protection Clause in Hall and all the affirmative action cases constitute an injury. Also under the Establishment Clause, the 4th, 5th, 9th, 10th, and 11th Circuits, following the Supreme Court Establishment Clause, jurisprudence have all held that when a government policy disfavors or demeans a religion, adherence to that religion suffers stigmatic harm and can have standing. And the Catholic League case in the 9th Circuit… Is it the Establishment Clause or Free Exercise Clause? Those cases are Establishment Clause cases. And the Catholic League case in the 9th Circuit, which is en banc from 2010, as well as the Awad case in the 10th Circuit in Moss v. Spartanburg. The district court dismissed the case because of no showing of injury. Or if there is an injury, it was not traceable back to the New York police. It was traceable to an article that appeared in the newspapers authored by a writer for the Associated Press. Correct. Why isn't that an accurate assessment of the injury issue? Well, with respect to the… The judge said, but for the article, you would not have known about the problem. You wouldn't have suffered injury. Yeah, so with respect to the causation issue, because I think we do detail a number of injuries, with respect to the causation injury, the law is fairly clear that the defendant's actions do not need to be the last step in the chain of causation. And injuries that only emerge as a result of third-party actions are still cognizable. That's Bennett v. Spears, and that's this court's decision in Pitt News. All we need to show is not proximate causation, although we certainly show that it's but-for causation. And but-for the city's surveillance, the AP would have nothing to report on. Do you assert injuries before the publication of the article? We do, Your Honor. Simply, the government act of discrimination and classification constitutes an injury. But injuries other than that? Before the publication, no. But we also assert that after the publication, government officials, these are in allegations around 60 of our complaints, city officials sort of doubled down on the justification for this program and said that this kind of suspicionless surveillance was necessary. So that sort of re-ups the causation. And the city has not pointed, where it's certainly redressable by an injunction against this program, and it's hard to imagine how you could have redressability without also having causation. I mean, we couldn't sue the AP and get redress. It's only the NYPD that causes the injury. And, of course, and so we have the situation. You wouldn't want to sue the AP. No, no, no. We might lose that battle. Well, you don't want to discourage them. Yes, yes, precisely. And, you know, contrary to the district court's assumption, we think the AP was playing an essential role in our democracy. And once they expose government wrongdoing, it seems to us that the court's role is to address that wrongdoing. Your time is running. What's your best case? I've looked at some other circuits, but no Supreme Court cases. Yes. You mentioned Presbyterian Church. Yes. On the showing of injury? On the showing of injury, that goes to congregant injury. The council for imams in New Jersey, two mosques that were actually surveilled, and changing in religious programming, that's Presbyterian Church. For the fact that a mere classification constitutes injury, I would say Hall, Anderson, and all of the affirmative action and racial gerrymandering cases, which identify classification as a harm independent of consequences. For the change in religious behavior, the change in religious practice in response to government, the free exercise claim, these cases are legion. To begin with, Friends of the Earth is enough. Isn't that really layered? Isn't that speculative? It's not speculative, Your Honor. When there is a present change of behavior that is reasonably, objectively reasonable, I would commend to you Judge Breyer's opinion, or Ron is off, then Judge Breyer's opinion, but even Friends of the Earth v. Laidlaw says when you change behavior in response to government illegality, that's actually happening. I mean, we allege his mosque was being surveilled, and to not go to that mosque is an entirely, we believe, objectively reasonable response to government misconduct. And then we also have economic injuries as well, which I think are a variety. If there's a legitimate concern that the City of New York has with regard to particular persons that might be subject to investigation for terroristic acts or possible terroristic acts, how do you narrowly tailor what they need to do to try to ferret that out? Well, to begin with, I think they have to be able to articulate at a minimum reasonable suspicion that someone is involved in that behavior. They have not articulated that here. Of course, we're on a motion to dismiss. They say the events of 9-11 is what triggered the need for this kind of surveillance. And don't you want to be able to determine who is a terrorist before you have reasonable suspicion of a particular individual? Your Honor, you might, but there are ample traditional law enforcement mechanisms that the NYPD in all its sophistication and other police departments can use. You could not do that any more than what the NYPD, I think, got in trouble for with respect to stop and frisk, which is using race as a proxy for criminality. You cannot use religion as a proxy for criminality. We're talking about, again, decent patriotic Americans who are subject to this surveillance based on no suspicion whatsoever. You mentioned traditional police methods that could have been used instead of the ones that they did? Yes, following leads, which I'm sure they do. This is a blunderbuss, suspicionless surveillance program based where the only search criteria is religion. And I can't emphasize enough that the Supreme Court has said we can't dismiss, you cannot accept the city's explanation that they're using race in a permissible way. Of course, for example, in Johnson v. California, that's the prison segregation case, the Department of Corrections in California surely said we are not discriminating when we segregate blacks and whites, we're merely trying to solve a very important problem with gang violence. Which said, you still have to apply strict scrutiny and make sure it's narrowly tailored. You mentioned, since we're in Philadelphia, Philadelphia Yearly. Philadelphia Yearly is a case as well. That's an injury, in fact, because we are talking about the district court's holding involving no injury on your part. Precisely, you're on Philadelphia Yearly, says that dissemination, publicly available information about individuals who are subject to surveillance would subject them to future harm. In our case, we have a number of MSA students who are worried about future employment harm and our lead plaintiff, Mr. Hassan, who is a decorated war veteran who may have a security clearance problem as a result of this. And Philadelphia Yearly supports standing on those grounds. Thank you very much. We'll hear from Mr. Farrell. May it please the court. My name is Peter Farrell, and I represent defendant, City of New York. Let me ask you, in connection with the standard to apply here, what is the standard? Is it strict scrutiny, intermediate scrutiny, what? Your Honor, we do not get to the standard in this case. Plaintiffs are required in their pleadings to plead an actual injury. We'll get to that. Assuming that they have pleaded, and you'll obviously have a chance to argue that, what is the standard that you suggest that we apply? Your Honor, in terms of this case, I'm focused on the pleading. If you got to the merits on this, I think that there are arguments to say that there should be a rational basis. They're claiming it's based on religion, which normally gets strict scrutiny, which means you'd have to have something that's narrowly tailored to achieve a compelling state interest, whereas intermediate scrutiny would be an important, must further an important government interest by means of something that's substantially related to that interest. The reason that is, Your Honor, is because it's a lesser standard. There's no policy. There's no written policy in this case. But is there a custom or practice? No, Your Honor. There's not a custom or practice. So why did they do it? Somebody tells them to go in and do the investigation, the type of surveillance that we're talking about. In fact, just this past weekend, you had the former mayor of New York suggesting that he was upset that the, quote, policy, close quote, has been discontinued. So, I mean, he's calling it a policy. It's not in the record, so it doesn't necessarily help. No, we don't know exactly what the policy is. Just that it's discontinued. Your Honor, there is no. He's talking about a policy of surveillance. There is no written policy. This case, at its heart, involves surveillance of public spaces and public activity. There's, Laird speaks to this on point. Laird involved allegations that go well beyond that were characterized by plaintiff's counsel. Laird involved allegations of chilling of First Amendment activity. It involved the use of undercovers. It involved attendance at public meetings. It involved attendance at church meetings. It involved preparation of field reports based upon the observations at those meetings. The district court relied very heavily on the case that you are now referring to, but Laird involved a challenge to a program, a program without the showing of any injury. But in this case, the plaintiffs are indeed enumerating a series of injuries that they have sustained as a result of the program, the custom, or the policy. Let me read the word policy. The injuries in Laird were more than that that were alleged. The injuries in Laird that were alleged were damage to reputation. But there was no showing of injury. It was just the program itself that was being challenged. But this is very different. This case is very different. Well, I don't see it as being different, Your Honor. I see it as being on exactly the same facts. Let me put the question this way. Were any injuries shown by the plaintiffs in Laird? It was a pleading stage, Your Honor. They accepted the allegations. Assessors. Yes, they accepted the allegations in the pleading. They would have to. The pleading contained allegations which were supplemented by affidavits in front of the court that claimed damage to reputation, an adverse effect on their employment, that the actions by the Department of Army in conducting surveillance and sending reports out throughout the country to the Department of Army bases was based upon harassment and intimidation. And it also alleged that a blacklist was created of the people that were surveilled. So the allegations and – Well, you had things that were compiled like locations of concern. And that if you knew, based on the safety story, what was a location of concern, let's say it was a mosque or a particular store, you might not frequent that store. And, for example, a mosque said that fewer people are attending services. Isn't that an injury? Isn't that an injury? No, Your Honor. How so? The basic tenet of standing requires a government policy that regulates, prohibits, or compels. That is a basic tenet of standing across all standing cases. Surveillance of public activity does not prohibit, compel anyone to do anything. If you extrapolated that, this is not a case that involves a stop. It's not a case that involves a search. It's not a case that involves a detention. It's not a case that involves an arrest. It's not a case that involves a prosecution. Did this city or New York Police Department policy target any group other than Muslims? I'm looking at the allegations in the complaint, Your Honor. I'm considering the complaint itself. And the question is that, or the point is that New York City Police Department was targeting a religious group, Muslims. And you're referring to something else, and I just want to know what the New York Police Department was targeting in its surveillance program.  They seek to draw an inference based upon... What was the purpose of the program? The allegations in the complaint, if you want to talk about plausibility, they're seeking to draw an inference that the purpose of the program was to discriminate on the basis of religion. And in order to do that... From the perspective of the New York City Police Department, what was the purpose of the surveillance program? It provides useful intelligence gathering so that in the event of, for example, they receive information about a terrorist threat. And say the terrorist is, they get information that the terrorist is Syrian, right? And is somewhere in the tri-state area. And they need to respond to try and find out where that person would be concealing himself or where that person may try and go to a place where he could recruit others to help. The city and the police department would need to know the geographical concentrations of people of Syrian ethnicity. They would need to know where those pockets of geographical concentrations are because the likelihood would be that somebody would try and conceal themselves among other people so that he would not stand out. But the target was restricted to a religious group, wasn't it? I mean, it was restricted to Muslims. The complaint says and alleges that the police department's, what it calls a program, was directed at ancestries of interest and identifying ethnicities. It says that in the complaint. And their own allegations make this point or show how it's a legitimate law enforcement purpose. They claim that the police department's, the city of New York police department's, going out after the publication of the Danish cartoon in 2006, which caused a worldwide reaction, a strong reaction among the Muslim community, which included at other parts of the world violence and even death. And they allege that as an indication or for support that the purpose of the program is to discriminate against Muslims. That may not be true. We don't know. But isn't at this point of the proceedings, isn't it the rule that we have to accept the pleadings as true? Iqbal speaks to this. You do not have to accept the conclusory allegations in the complaint. It's not conclusory when someone says that there is lesser attendance at a mosque. It's not conclusory when they say there's fewer monies coming in. It's not conclusory when they say my store has less money coming in and there's economic injury. That's plausible. The plausibility is not directed at the injury. The plausibility, Your Honor, is directed at whether, and this is a test stated by the Supreme Court in Iqbal, whether to be plausible the city acted because of the adverse effect upon Muslims. That is the key. That is the key to the entire plausibility case that the city's actions in order to plead a case for purposeful discrimination, which is what this is, has to be that the city took its actions of the public surveillance alleged because of the adverse effects that were imposed upon Muslims. Okay, but our questions right now are directed to the issue of injury, and the injury to the mosques by a decrease in attendance, the injury to the commercial locations by a decrease in customers, and don't we have to accept that as true in the complaint? Don't we have to then permit having taken the first step, permit the plaintiffs to take the second step, and maybe they can't show that this is a policy directed at Muslims just because of prejudice against Muslims. Maybe they can show, the defendants can show other reasons, but based upon the complaint itself, accepting the complaint as true, at least for some of the defendants, don't we have to accept that they have passed the Iqbal standard and presented a plausible theory of relief? Your Honor, you can accept the allegations of injury as true, but under land, those injuries that they allege are not concrete and particularized. Loss of attendees at a mosque is a concrete injury, isn't it? No, not in this case, Your Honor, because the public surveillance does not constrain or compel or prohibit attendance at a public mosque. All the injuries that they allege are self-imposed injuries based upon subjective fears. The police department is not prohibiting anyone from attending a mosque. It has taken no steps to inhibit anyone's employment. They're self-imposed fears. If you're a Muslim and you go to a mosque religiously, and you knew that the New York City Police Department was surveilling that mosque, you know, I don't think I want to go there anymore. Maybe I pick another mosque. So it's the result of the practice that causes an injury, isn't it? And if I knew that you were looking at my business and photographing my business, and if customers of that business knew that it was subject to surveillance, they would not want to go into that business anymore. Aren't those concrete losses? Aren't those concrete injuries pled by the plaintiffs? Those injuries are based upon subjective fears. If there was a police officer standing in front of the store... But it's not a subjective fear to know that the mosque that I want to go to is under surveillance. And that I don't go there because of that. That's subjective. You may have a subjective view that maybe I shouldn't go there, but the bottom line is that the mosque itself objectively has fewer attendees, objectively has less money coming in. Commercial outlets have objectively less money coming in. A few things, Ronna. That's not all the plaintiffs. None of the individual plaintiffs allege those injuries. It's not all the plaintiffs, but there are plaintiffs who, taking as true the allegations of the complaint, have suffered injuries. I would point the court to Clapper v. Amnesty International. There the court said that, and I think it was in footnote 7, that someone imposing, even though they may have fears, those are self-imposed fears. There may be other people who don't share those fears. There may be people who would go to mosques and frequent stores and would be appreciative of having... We asked Mr. Azmi, what would narrow tailoring be if we applied the test that he wants, which is strict scrutiny? And he said, for example, reasonable suspicion following leads. So if you have reasonable suspicion that Mr. X could be a problem with regard to terrorism, well understood. The concern that they have, the plaintiffs here, is that if you don't have reasonable suspicion, that all of the others besides Mr. X are not under any kind of suspicion, and you go out and you investigate and surveil them on a continuing basis, they believe that you're doing so as a result of their religion and nothing else. There is no reasonable suspicion. There is no following of a lead. And they're saying that that survives 12b-6, motion to dismiss. No, that's not survived. There's no allegation in this complaint. I mean, they're using the term surveillance. But isn't that really the crux of what we're here for? I don't see that, Your Honor. I see it as that they're claiming that the police department cannot conduct observations in public. They use the term surveillance. Nobody in this case has claimed that they're being followed. The six plaintiffs don't even allege that they personally were surveilled. Well, you don't have to follow people anymore. You've got cameras on all the light posts. Photography and videotaping, those were addressed in Philadelphia yearly. The Philadelphia Police Department went out and took photographs and did videotaping. The court said those actions of public surveillance do not create a concrete injury. For example, let's go back to another religion, another day, another time. You have abortion clinics and you have persons who are adamantly opposed to abortion and they're willing to take actions. Those persons primarily or were often Catholics and Baptists. What was done, it wasn't that Catholics and Baptists per se were followed. You have people like Randall Terry and others who were involved with the abortion clinics and they were suspected of violence. And you looked at those persons and those around them who interacted with them. They were following a reasonable lead. Here, the argument is significantly more than that.  You're following everyone who is of a particular religion to see if somehow they might be interacting at some point in time with places where the persons of interest might go. And it's qualitatively different is what they're arguing here. They're arguing that there's a custom, a program that you call it, of surveilling these persons just because they are of a particular religion. Isn't that much different than the case that deals with abortion? Your Honor, the allegation that we're doing it based solely upon religion is a conclusory allegation that under Iqbal it's entitled to no weight. You need to look at these. What's conclusory about it? Tell me. Because it's a conclusion that says the actions, which are facts, are done because of solely on the basis of religion. Iqbal, in the complaint, if you compare the Iqbal complaint and the court's opinion, it goes through and it says which are the conclusory paragraphs in Iqbal's complaint. Iqbal fled. Iqbal involved an arrest of the plaintiff, a detention, in a maximum security where he could not talk to anyone on the outside. His pleading in Iqbal stated those actions of holding him in a maximum security was based solely upon his religion. The court in Iqbal said based solely upon his religion is a conclusory allegation that is not entitled to weight at the pleading stage. The court then went on to look at the facts to determine whether his arrest and subsequent detention in high security was plausible that it was based on the fact that he was solely based on his religion. May I give you a statement from the Ninth Circuit? This is a case that was decided over 25 years ago in the Ninth Circuit. Churches as organizations suffer cognizable injury under the First Amendment when a certainly illegal government conduct deters their adherents from freely participating in religious activities. That was a surveillance program just like this one. Why doesn't that court's ruling inform us as to which way we should proceed with the injury issue? Is that Presbyterian Church, Your Honor? Presbyterian Church. A, that's not controlling it. It's a Ninth Circuit case. Two, that case misapplied Laird. The cross of that case holding said that the plaintiffs in Laird were not the subject of surveillance. And it made the distinction that those plaintiffs in Laird, because they were not the subject of surveillance, that the Supreme Court's rationale behind Laird did not apply to the case before it where they were actually subjects of surveillance. We've shown that in our papers, Your Honor. It's without a doubt that the plaintiffs in Laird were the subjects of the surveillance. And the court, despite that, despite the alleged injuries, held that those are insufficient and not concrete injuries to provide standing. Your Honor, I see my time is up. Mr. Osme stated in response to one of my questions that the policy of the New York City Police Department did not have to be demonstrated in the complaint that it could wait further proceedings and further development and further discovery. Now, can you take the opposite position? And what case do you base your position on? Your Honor, you don't get to go past the pleading stage based upon a conclusory allegation that the policy or the practice they complain of is based solely upon religion. You just don't get to engage in discovery to try and unearth the policy. You have to look at the facts of this case and look to see what those concrete injuries are. It sounds like you have to try the case in the complaint, which seems totally wrong. It sounds to me like you're at some re-judgment stage here. No, Your Honor, I'm looking solely at the pleadings. Well, the pleadings do demonstrate a focus on Muslims and no one else. And with the reports that the AP publicized, I think that strengthens the supposition that the policy is directed at Muslims. And it's your position that that is not sufficient to pass the 12B6 stage because, what, because there are other reasons it could be done or what? Your Honor, the assumption in your question is that they have pled concrete injuries. The injuries they have pled are not concrete. They're not recognized by the Supreme Court. Well, what about the mosques? They've pled that there is a decrease in attendance since it has been determined that the attendance is down in the mosque because of the surveillance. Declared a dislocation of interest, dislocation of concern. And that is a subjective, self-imposed That's not subjective. That is an objective loss of attendance, an objective loss of income to the mosque. The persons who are not attending the mosque are subjectively doing so. They're not being compelled or prohibited by the police department. Okay, but it's not their state of mind. It's what has happened to the mosque that is one of the injuries pled in the complaint. Your Honor, I would say that the decision in Clapper v. Amnesty International recognizes that some third party who, you know, doesn't act because of subjective fears does not create a concrete injury. How about the merchant in a store who loses customers, who loses money, dollars? That's very concrete, and the customers are not going there because they have this fear that they're going to be photographed and that the customers of the store are being surveilled. Isn't that a concrete injury? No, Your Honor. When you lose money, to me, that's concrete. Again, it's the third party, because of self-imposed fears, are not going to attend a particular store. If you just extrapolate what you're saying, then, any business anywhere, right, in New York City, for example, there are police outside of it, walking by, standing there. If somebody comes down the street, and that particular business owner says, you know, I really don't like the fact that there's a police officer who stands outside my business, or I don't like the fact that there's a police car that drives down my street, I think I'm losing customers. Right? That person, if you extrapolate, that business owner would have standing. No, he wouldn't. All he would have to do, then, is say that the only reason that that police officer stands in front of my business or drives down my street, and then you can insert. You can insert an ethnicity. You can insert a race. You can insert a religion. All right. You would have to support that by similar situations with persons of the same ethnicity, race, or religion. I mean, here you have the plaintiffs have asserted not just one person saying, there's a policeman outside my store. There are a number of plaintiffs saying that there is a policeman outside my store, and there is a report which indicates that these policemen are deliberately outside my store because of my ethnicity, race, or religion. So it's not just outside the store. You've got an AP report that's saying to those folks, hey, this isn't just something you're just thinking about. They're there for a purpose, or as you call it, a program. And that goes to causation, Your Honor. This program, as alleged, went from 2002 through 2012. For 10 years, plaintiffs, by their own allegations, did not suffer an injury. Their allegations, every single one of them says the injury occurred after the Associated Press wrote their articles and released documents, where the Associated Press released those documents without redacting, identifying. Because before a lot of people didn't know about the program, but now as a result of what the press put out here, they now do know of the program. Let me go back to what is the difference to you between a program, a custom, a practice, or a policy? A written policy on its face, if it said, we are going to surveil the Muslim community based solely upon religion. Policies can be oral, can't they? Yes, they can. I was just trying to explain what the difference was. In my opinion, the difference was it can be oral or stated. If it was written or stated, it said, we are going to surveil the Muslim community based solely upon religion, whether it is oral or in writing. That on its face would be a discriminatory classification. Here, there is no such. What is the difference between a program and a practice? Because a practice requires, Your Honor, that the inference of discriminatory purpose be drawn from the acts alleged. You don't have a statement by the city saying we are doing it because it is based solely upon religion. When it is a practice, which is what they allege where it is acts, they are trying to assign a discriminatory purpose to those acts. That is a conclusory allegation. So the question is, is it plausible that the acts they are complaining about, that the police department goes out and conducts surveillance and gathers intelligence so it would know where to respond to a potential terrorist trying to hide, whether that act is solely because of the adverse effect it is going to have upon the Muslim religion. And our position, and I think it is soundly supported in Iqbal, is that that is not a plausible claim in this case. When you juxtapose their allegations that the program was instituted immediately after 9-11, and in response to 9-11, that was an act that was carried out by 19 Arab Muslims, and these are the facts that are relied upon in Iqbal, 19 Arab Muslims who were led by Osama bin Laden, who was an Arab Muslim, and the disciples of Al-Qaeda who were all Arab Muslims. Those are the facts that the Supreme Court relied upon to say that the discriminatory inference that the plaintiff, Iqbal, was trying to draw based upon his arrest and his subsequent segregation and detention was based solely on his religion. Refresh our recollection then. What was the program here that was in existence since 2002? By plaintiff's allegations, the program that is in existence is all the things that they alleged, that there was public surveillance of businesses, of restaurants, of mosques, of all the various types of things you would find in a community. And how does that not survive a motion to dismiss? Because to assign the label that that is being done solely based upon religion, it has to be plausible. Applying common sense in your judicial experience is what Iqbal counsels. You'd have to step back and say... It's amazing how broad our thought of what is plausible has become during our tenure as judges. You would have to say that it's plausible that the New York City Police Department, right after 9-11, right after the threat that it faced, the additional continuing threat posed by Islamists who were radicalized to violence, that the actions that they alleged to go out and conduct public surveillance was solely because of religion. That is not the case. The primary purpose, right, if Islamists were radicalized to violence and not carried out the terrorist attack, if it wasn't the illegal and unlawful activity, the police department would not be looking at and trying to figure out where ethnicities are geographically located and looking at Muslim businesses and mosques. It sounds like you're justifying the surveillance program. I'm sorry? It sounds like you're justifying the surveillance program. At the summary judgment stage, yeah. Your Honor, I'm not doing that because of what Iqbal counsels... Let me say that, in fact, having looked at the district court opinion, it seems like the district court opinion relied on the city's justification for the program. Whether it was good or not, it seemed to rely on the justification. And this is a critical point, Your Honor. I'm glad you raised it because I would be remiss if I didn't address it. The plausibility standard, right, as articulated by the Supreme Court, says when you're determining whether something is plausible, right, it also looks at whether there's a more likely explanation. Those are the words that come out of Iqbal. Is there a more likely explanation? You're not picking between two plausible theories. You're looking at whether the allegations, the discriminatory inference that the allegations look to draw, whether that's plausible. And Iqbal says you get to look at the more likely explanation. But you're restricted to the explanation as it emerges from the pleading itself. Absolutely, and the pleading here, Your Honor, explicitly articulates that the program started immediately at 11. You look at what the plausibility is under Iqbal and Twombly from 10,000 feet. What it really means is when somebody makes an allegation in a complaint, could it be true? It isn't the old test, well, it might be conceivable, but is it true? Is there something backing it up? Here the allegation is that they're being surveilled based on religion, and the things that back it up are the things that we've talked about with regard to whether there is an injury in fact, decreased attendance, fewer sales at commercial outlets, et cetera. How is that not plausible? How is that not something that's alleged with some facts in the background to support it? That is discriminatory impact. Iqbal addresses this head-on. It says there may be a discriminatory impact, but a discriminatory impact is what you are looking at. You're looking at the injuries that may be alleged to be in cause. It's not evidence of discriminatory purpose. Purpose requires the plausibility of the purpose. And the Supreme Court said in Iqbal, yes, the actions of the – Wait a minute, you've lost – plausibility of the – what do you mean by that? Plausibility of the purpose, what does that mean? What I'm saying, Your Honor, is this Court needs to determine whether the inference of a discriminatory purpose is plausible based upon the facts alleged. Because there is no explicit policy saying that we're going to do it solely on the basis of religion. There is no oral or written policy. They are relying upon external factors to say, well, look at this. And from these factors, you can infer a discriminatory purpose. That inference that they want this Court to infer has to be plausible. And you get to look at a more likely explanation for the conduct that they are trying to rely upon. And how can I sit here and say, based on those allegations, that it's not plausible? Remember, we're 12 v. 6. How can I say that that's not plausible? You've got to admit that there are a number of people in this country who are very prejudiced against Muslims because of 9-11. And whether those individuals include the ones who have instituted the surveillance policy or practice in New York City, how can we know at this point? You know, maybe with some discovery, we can see that, yes, this was truly a police investigatory. Anyway, it was the police trying to find out, to ferret out terrorism before it developed. Or it was members of the police department who were, unfortunately, prejudiced against Muslims. And don't we need to permit further discovery in order to make that determination of which reason for the practice is the most logical, rational? No, you do not need to permit more discovery. It may even have been in Clapper v. Amnesty International where they addressed that. You know, you don't get to go and conduct discovery to try and support your standing or your claim. Let's go back to your point of conceivable. The Supreme Court specifically said, while Iqbal's claims may be conceivable, that he was detained in high security, that may be conceivable, that does not mean that they are plausible. So there's a distinction that the Supreme Court has put on between conceivable and plausible. And here I would urge the Court to go back, look at the complaint, the allegations, and that it is set up as a response post-9-11 in response to the terrorist attacks against New York City. And it's not plausible, the inference they're asking you to draw, that surveillance after that event was based, was because of the city's wanting to have an adverse impact upon the Muslim community. I think the difference is that prior to the AP report, someone might perceive that he, she, or that person's places where they frequent are under surveillance as a result of religion. That's conceivable in 03, 04, 05. But after the report, it now has support and it becomes plausible, does it not? The AP's report assign an impermissible purpose to the surveillance. It's not a police department policy statement. They assign a discriminatory purpose. And I would urge the Court not to look at... No, what they're saying is that the surveillance was done primarily as a result of being Muslim. And that the test for that is strict scrutiny. And that ultimately you have to bear the burden of showing that this compelling state interest that you have to stop terrorism, no one disagrees with that. That it's narrowly tailored to that compelling state interest. And that seems to be something that has to be done down the road, not today. Your Honor, I would ask the Court then to go back and look at Iqbal. There the claim was the actions were taken solely because of religion. The Court decided plausibility. It did not go into an analysis of whether strict scrutiny applies or some other standard or whether it's narrowly tailored. Under the Court's... If I'm hearing the Court correctly, then whenever you have an allegation of being solely based upon religion, the plausibility standard would never apply. Back to my example. It's taking what was conceivable at one time and adding to something more. The fact that there is, according to this report, a program or a policy, whatever you want to call it, that does single out people because of their religion for surveillance. That's a reporter's opinion, Your Honor. It's not based upon a policy or a statement. And if anything, that shows that the injury... But at this point, does it not deserve a further look? Your Honor, I think... We know you're going to say no. But I have reviewed Laird. I have reviewed Laird. I have looked at the transcript of the oral argument. It's available online. I was able to find it on Oyez.org. You go through it. The allegations are almost exactly the same as the case here. And this shows not a concrete injury. And Iqbal would have to have gone through and said, we can't decide this now because there's an allegation of a discriminatory purpose from which you want us to draw an inference from being held in high security. And they would say we can never decide that. That's not the rule. You get to decide plausibility. We're now going round and round. Anything new for the questions? No, Your Honor. I think that's everything I have. Thank you very much. Thank you. Mr. Rasmi. Thank you, Your Honor. A few brief points. At this stage we do not need to show that the sole reason or sole justification for the discrimination is religion. We just need to show the sole criteria or a criteria is religion. That states a claim for facial classification, triggers strict scrutiny, and survives Iqbal because we have ample non-conclusory allegations demonstrating a classification. Throughout the complaint I'll focus on just two examples. Paragraphs 40 to 42 deals with the ancestries of interest mentioned by counsel. There they identify 28 ancestries of interest who represent 80% of the world's population. But it goes further to focus laser-like on religion so that they surveil Egyptian Muslims, but not Egyptian Copts, Syrian Jews, but not Syrian Muslims. They surveil immigrant communities. You already got that one mixed up. Sorry. Excuse me. Thank you, Your Honor. I'm very helpful. And they surveil immigrant communities. Mr. Shores, we're listening. Yes. No, I appreciate that. I wish I could say that was a test, but it wasn't. And then take paragraph 59. Just for example, this deals with the NYPD's desire to identify threats from a nuclear Iran. Fair enough. But the NYPD admits that most Iranians in the United States are not Muslim, yet they focus only on Shia Muslims. And in that program, as part of that program, they focus on Lebanese and Syrians, not because they're from Iran and would have loyalty, but because they're Muslim. Those are all non-conclusory allegations. With respect to Laird, Judge Frantz, I think you're right. Ultimately, it's a generalized grievance case. They can articulate no injury. The court stressed that at bottom, their claim simply stated is that they disagree with the judgments made by the executive branch with respect to the type and amount of information the Army needs. And in footnote 7, the Supreme Court stresses that plaintiffs in that case actually admitted they were too courageous themselves to be chilled and that they were standing in the place of thousands of others less courageous. Our plaintiffs here, of course, allege direct personal stake in the outcome. The notion that there has to be government compulsion for an injury is not in the law. Catholic League is a case that involved a non-binding resolution criticizing the Catholic Church and two Catholics in the jurisdiction had standing. Clapper is plainly distinguishable because the subjective actions they took could not be caused by the surveillance program because surveillance was so utterly speculative. Here, all our plaintiffs were either directly surveilled or members of organizations that were subject to surveillance. The critical point is we have pled what we need to plead to survive. A motion to dismiss. Did any of the individual plaintiffs say that they were directly surveilled? Yes, Your Honor. The mosques and the MSAs were subject to and were listed in NYPD reports. Well, the mosques, right. Yes. But the individual plaintiffs. No, the individual plaintiffs do not. They allege that they were either members of mosques or the MSAs that were surveilled. So seven allege direct surveillance for membership within surveilled individuals. And I'll just conclude by saying there is certainly procedural error that justifies this reversal, but there's more as well. The district court, we believe, sanctioned overt discrimination against a protected class and demeaned and stigmatized an entire religion. Thank you. Thank you. Thank you to both counsel for very comprehensive oral arguments. We'll take the matter under advisement. I would ask counsel if you would get together with the clerk's office and have a transcript of this oral argument prepared with the cost to be split evenly. Thank you very much. We'll recess and continue.